IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

BRETON, LLC, *et al.*,                          )
                                                )
               Plaintiffs,         )
                                                )
           v.                       )        No. 1:09cv60 (AJT/TRJ)
                                                )
GRAPHIC ARTS MUTUAL INSURANCE )
    COMPANY, *et al.*,                      )
                                                )
            Defendants.            )
_____)

## MEMORANDUM OPINION

On December 2, 2007, a fire destroyed warehouse properties owned by the

Plaintiffs Breton, LLC, Herman Ward, Inc., and B&H Management Company[1]

(collectively referred to as "Breton" or "Plaintiffs") and insured by defendant Graphic

Arts Mutual Insurance Company ("Graphic Arts"). Following the fire, it appeared that a

sprinkler system installed in the one of the damaged warehouse properties was not

triggered by the fire because its water supply valve was in the "closed" position at the

time of the fire, thereby shutting off the system and rendering it inoperable. Defendant

and cross-claim plaintiff Lincoln National Life Insurance Company ("Lincoln National")

claims to be the current mortgage holder of the destroyed properties and therefore an

insured under the mortgagee clause of the Graphic Arts insurance policy issued to Breton

with respect to the fire damaged properties. This matter is before the Court on cross

---

[1] Plaintiff Breton, LLC, is a limited liability company organized under the laws of the Commonwealth of
Virginia. Plaintiffs Herman Ward, Inc. and B&H Management Company are members of Breton, LLC and
join as plaintiffs solely in that capacity.

motions for summary judgment filed by all parties with respect to the parties' respective

rights and obligations under the Graphic Arts policy.

The primary issue in this case revolves around whether Breton satisfied its

obligations under the policy's "Protective Safeguards" endorsement, which sets forth

Breton's obligations with respect to the sprinkler systems on the insured properties. More

specifically, and briefly summarized, the issue is whether Breton satisfied its obligations

to "maintain" the sprinkler system in light of the closed supply valve that was discovered

after the fire; if so, whether it remained in "control" of that sprinkler system after it had

leased the properties to a commercial tenant, and if it was in "control," whether it

breached its continuing obligations to "maintain [the sprinkler system] . . . in complete

working order" because of the allegedly closed supply valve.[2] As to Lincoln National,

the issue is whether in the event Breton is excluded from coverage, Lincoln National,

through its acquisition of the original lender on the properties, acquired interests

sufficient to recover under the mortgagee clause of the Policy, and if so, whether it has

discharged its duties of cooperation under the policy. All parties contend that there are no

genuine issues of material fact with respect to these motions and that each is entitled to

summary judgment in its favor as a matter of law.  For the reasons set forth herein,

Plaintiffs' motion is GRANTED and Graphic Arts' cross-motion as to Plaintiffs' claims

is DENIED. Because Lincoln National's Motion for Summary Judgment seeks

declaratory relief only in the event that Breton does not have coverage under the policy,

the Court's decision herein regarding Breton's coverage claim eliminates the need to

---

[2] Breton contends that there is a dispute concerning whether the sprinkler supply valve was closed at the time of the fire. *See* Plaintiffs' Motion for Summary Judgment. at 12.  That disputed issue, however, does not create a genuine issue of material fact for the purposes of the pending summary judgment motions since the Court's ruling does not depend on whether or not the supply valve was in fact closed at the time of the fire.

consider Lincoln National's cross claim. Therefore, Lincoln National's Cross Motion for Summary Judgment against Graphic Arts and Graphic Arts' Cross Motion for Summary Judgment against Lincoln National are DENIED as moot.

## I.     Background

### A.    <u>The Applicable Provisions of the Policy</u>

In 2003, Graphic Arts and Breton entered into an insurance contract with respect to eight separate properties, Commercial Package Policy CPP 3438683, and in April, 2007, executed a renewal of that policy effective for the period April 1, 2007 to April 1, 2008 (the "Policy"). Plaintiffs' Motion for Summary Judgment ("Pls."), Ex. 2 (Policy). Part of the Policy is the Protective Safeguards Endorsement (the "Endorsement"), which provides that "[a]s a condition of this insurance, you [Breton] are required to maintain the protective devices or services listed in the Schedule above." Pls. Ex. 2 (Policy), Protective Safeguards Endorsement, Form IL 04 15 10 91 at ¶ 1, at 43. The applicable "protective devices or services" are referenced as "P-1" in the "Schedule," which is described as "an automatic sprinkler system, including related supervisory services." *Id.*[3] The Endorsement further provides in paragraph 2 the following exclusions from loss:

---

[3] Paragraph 1(b) reads, in part:

> The protective safeguards to which this endorsement applies are identified by the following symbols:
> "P-1" Automatic Sprinkler System, Including related supervisory services.
> Automatic Sprinkler System means:
> (1) any automatic fire protective or extinguishing system, including connected:
>     a.   sprinklers and discharge nozzles;
>     b.   ducts, pipes, valves, and fittings;
>     c.   tanks, their component parts and supports; and
>     d.   pumps and private fire protections mains.
> (2) When supplied from an automatic fire protective system:
>     a.   Non-automatic fire protective systems; and
>     b.   Hydrants, standpipes, and outlets.

> We [Graphic Arts] will not pay for loss or damage caused by or resulting from fire, if prior to the fire, you [Breton]:
>
> a. Knew of any suspension or impairment in any protective safeguard listed in the Schedule and failed to notify us of that fact; or
> b. Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.
>
> If part of an Automatic Sprinkler System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

*Id.* The Policy also contains an anti-assignment provision, which states: "Your [Breton's] rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured." Pls. Ex. 2 (Policy) at Form IL 00 17 11 98 at § (F).

As to Lincoln National, the Policy provides that a mortgage holder shown in the declaration has the right to receive payment under the Policy even if the primary insured is denied coverage as long as the mortgage holder follows certain guidelines, including following the insurer's requests regarding premiums and statements of loss, as well as cooperating with the insurer's investigation of any claims.[4] Lincoln National Motion for

---

[4] The Policy provides at LN Ex. 2 (Policy) at Form CP 00 10 1091:

> 2. Mortgage Holders . . .
>
> b. We will pay for covered loss of or damage to buildings or structures to each mortgage holder shown in the Declarations in their order of precedence, as interests may appear. . .
> d. If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgage holder will still have the right to receive loss payment if the mortgage holder:
> (1) Pays any premium due under this Coverage Part at our request if you have failed to do so;
> (2) Submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so; and
> (3) Has notified us of any change in ownership, occupancy, or substantial change in risk known to the mortgage holder.

Summary Judgment ("LN") Ex. 2 (Policy) at Form CP 00 10 1091 § (F)(2).  The Policy

further provides that "[Graphic Arts] will not pay you more than your financial interest in

the Covered Property."  LN Ex. 2 (Policy) at Form CP 00 10 1091 at Condition E(4)(c).

Listed as a "mortgage holder" in the Policy is Jefferson Pilot Life Insurance Company

("JP Life"), a company that Lincoln National acquired in 2007, prior to the fire. LN. Ex.

6 (Certified Certificates of Merger).

### B. Plaintiff's Motion for Summary Judgment

Among the properties insured under the Policy are two parcels of land, owned by

Breton, located at 7396 and 7398 Ward Park Avenue, Springfield, Virginia, each of

which is improved by a freestanding warehouse (collectively referred to as the

"Properties").  The warehouse at issue in the case is a 37,500 square foot structure

located at 7396 Ward Park (the "Property"). Installed on the Property is a sprinkler

system designed with a closable supply valve that controls the flow of water (the "Supply

Valve").  When a sprinkler head opens due to fire, water then flows through the Supply

Valve and out through the sprinkler heads.  The Property has a room dedicated to housing

the sprinkler control valve and various other equipment related to the sprinkler system

(the "Sprinkler Room"). Pls. Ex. 1 (Deed); Ward Aff. at ¶ 5-6, 11.

---

e. If we pay the mortgage holder for any loss or damage and deny payment to you
because of your acts or because you have failed to comply with the terms of this
Coverage Part:
(1) The mortgage holder's rights under the mortgage will be transferred to us to the
extent of the amount we pay; and
(2) The mortgage holder's right to recover the full amount of the mortgage holder's claim
will not be impaired.

At our option we may pay to the mortgage holder the whole principal on the mortgage
plus any accrued interest. In this event, your mortgage and note will be transferred to us
and you will pay your remaining mortgage debt to us.

Beginning in 1996, Breton leased the entire Property to Alexandria Packaging Co. In 2004, Joe Ragan Coffee, LTD ("Ragan Coffee") purchased the assets of Alexandria Packaging Co. and occupied the entire warehouse located on the Property pursuant to a lease entered into directly with Breton. Pls. Exs. 8 (Deed of Lease) and 9 (Addendum). Under Breton's lease with Ragan Coffee, Ragan Coffee assumed responsibility for the repair and maintenance of the Property.[5] Specifically, the lease requires that:

> Tenant at its expense shall at all times maintain said Premises in good condition and repair, including all mechanical, plumbing, and electrical equipment and also in clean sanitary and safe condition in accordance with all directions, rules and regulations of the . . . fire marshal, building inspector . . . .

Pls. Ex. 8 (Deed of Lease) at ¶ 17.

Pursuant to these leases, Breton's tenants have had the exclusive right to occupy the Property; and since leasing the Property in 2002, Breton's tenants have had exclusive possession of the Property, without the ability on Breton's part to access the Property generally or the Sprinkler Room in particular without the assistance of its tenant.[6] It also appears from the record that Graphic Arts has known that Breton leased the Property to tenants and that it did not have the unfettered ability to enter the premises for the purposes of inspection or repairs. In this connection, the record reflects that in 2002 and again in 2007, Breton informed Graphic Arts during inspections of the Properties that it could not provide access to the Sprinkler Room because it did not have a key to the room.

---

[5] Breton and Ragan Coffee appear to disagree over the extent of Ragan Coffee's responsibilities with respect to the sprinkler system. This dispute, however, is not a material one for the purposes of Breton and Graphic Arts' cross-motions for summary judgment.

[6] During the life of the lease to Alexandria Packaging, Breton did not have keys to the Property. Pls. Ex. 6 (Lease). When Breton entered into its lease with Ragan Coffee in 2004, Ragan Coffee obtained its initial set of keys to the Property from Alexandria Packaging. Pls. Ex. 31 (Ragan Dep.) at 24. Ragan Coffee then installed new locks on the Property, without providing a set to Breton, who continued to lack access to the Property. Ward Aff. at ¶¶ 29, 31; Stoddard Aff. at ¶ 23.

Stoddard Aff. at ¶ 31-32; Graphic Arts Motion for Summary Judgment Against the

Claims by Plaintiffs (GA) Ex. D (letter) at 1-2. Following the 2007 inspection, Graphics

Arts, by letter dated October 24, 2007, made certain "recommendations" to Breton,

including that the Sprinkler Room be inspected and necessary repairs be made, coupled

with the request that Breton respond to these recommendations within 45 days, viz., on or

before December 9th, 2007. GA, Ex. D (Letter) at 2.  The fire occurred on December 2,

2007 before Breton responded to Graphic Arts' letter.

     As a result of the fire, the warehouse located on the Property was a complete

loss.[7] Ward Aff. at ¶ 52; Pls. Ex. 20 (Fixed Property Record) at FM-TB-0177.  On

December 6, 2007, following the fire, the fire department inspected the Sprinkler Room

and found that the Supply Valve was in a closed position such that it would not let water

flow to the sprinkler heads, but that "[t]he valve was operated to make sure the

latching/locking mechanism was intact and functional and it was."  Pls. Ex. 20 (Kinnier

Report) at FM-TB-189. Graphic Arts does not contest Breton's contention that Breton did

not turn the supply valve off or have knowledge that the sprinkler system had been turned

off at the time of the fire. *See* Ward Aff. at ¶¶ 58, 60; Stoddard Aff. at ¶¶ 37, 45; Pls. Ex.

31 (Ragan Coffee Dep.) at 98-99.

     By letter dated September 11, 2008, Graphic Arts denied Breton's claim for losses

at the Property.  Pls. Ex. 13 (Denial Letter).  As grounds for its denial of coverage,

Graphic Arts stated that its investigation had "shown that your company failed to

maintain the automatic sprinkler system at [the Property] in violation of the terms and

---

[7] The warehouse located on the property located at 7398 Ward Park Avenue was also damaged in the fire.
There is no evidence that the sprinkler system in that warehouse did not operate and Graphic Arts has not
denied coverage as to the damage to that property. *See* GA at 3, n. 2.

conditions of the Protective Safeguards endorsement and the Common Policy Conditions endorsement to the Policy." *Id.*

### C. Lincoln National's Motion for Summary Judgment

On July 31, 2003, Jefferson Pilot Financial Insurance Company ("JP Financial") made a commercial mortgage loan to Plaintiff Breton, LLC in the original amount of $8.2 million. LN Ex. 8 (Spearman Aff.) at ¶ 4. As security for the loan, JP Financial obtained a Deed of Trust on Breton's five warehouse properties in Springfield, Virginia, including the Property. LN Ex. 1 (Certified Copy of Deed of Trust). In the Policy, as re-issued and as it existed at the time of the fire, only JP Life, a separate entity, was listed as the "mortgage holder" under the mortgage clause of the Policy. *Id.* at Form 8-S-1019.[8] JP *Financial*, which made the loan, is not shown as a mortgage holder in the Policy. JP *Life*, however, did not make any loan to Breton and was not a mortgage holder when the Policy was originally issued or renewed. Spearman Dep. at 16:19-17:8, 18:11-18. In April, 2007, Lincoln National entered into a series of transactions that resulted in the merger of JP Financial and JP Life into Lincoln National. LN Ex. 6 (Certified Certificates of Merger).[9]

Graphic Arts has denied coverage to Lincoln National under the mortgage clause on the grounds that (1) JP Financial was never an insured under the mortgage clause and

---

[8] The policy originally issued in 2003 is not in the record and it therefore does not appear in the record who was listed as the "mortgage holder" under the policy when it was first issued. A copy of two standard "ACORD" forms do appear in the record, both dated June 23, 2003, both issued by The Jacobs Company, Inc, which was acting as an independent broker with respect to the Policy. One ACORD form is titled Evidence of Property Insurance and lists only JP Life as a "mortgagee" and an "additional insured." The other ACORD form is titled Certificate of Liability Insurance. This Certificate lists "Jefferson Pilot Life Ins. Co. or Jefferson Pilot Financial" as a "certificate holder" who would receive written notice of any cancellation of the Policy. No one contends that any entity other than JP Life was listed as a mortgage holder on the actual Policy as originally issued in 2003. *See* LN Ex. 8 (Spearman Aff.) at Tab B.

[9] Lincoln National contends that it did not know that JP Financial was not listed as the mortgage holder until after the loss, and relied on the ACORD form when the policy was first entered into. Spearman Dep. at 39:7-13.

therefore Lincoln National, as JP Financial's successor in interest, cannot be an insured; (2) JP Life, the named insured, was never, in fact, a "mortgage holder" and therefore did not have a financial interest in the Property sufficient to acquire any rights under the Policy that Lincoln National can enforce as a successor in interest to JP Life; and (3) in any event, Lincoln National never complied with other Policy conditions including giving notice of loss and cooperating with Graphic Arts as required. Graphic Arts also contends that it never formally denied coverage for Lincoln National's claims before Lincoln National filed its claims against Graphic Arts in this lawsuit and therefore Lincoln National further breached its duties under the Policy by asserting its claims in this action. In response to Graphic Arts' position, Lincoln National contends that since it is the successor in interest to both JP Life and JP Financial, it is a named insured under the mortgage clause through JP Life and may therefore recover through the mortgage clause to the extent of the financial interest it acquired in the Property through JP Financial. Lincoln National also responds that it was not required to provide notice of the loss since Graphic Arts received notice from Breton and that it has otherwise complied with all other applicable conditions.[10] As for its claims in this lawsuit, Lincoln National denies that it was prohibited from asserting these claims after it was joined as a defendant by Breton, particularly since it understood that Graphic Arts had decided to deny its claims, as evidenced by its position in this action. Lincoln National further argues that, in any event, by not moving to dismiss Lincoln National's claims for failing to further negotiate,

---

[10] Graphic Arts does not dispute that it never requested that Lincoln National pay any premium or asked Lincoln National to submit a statement of loss in order to recover under the mortgage clause. LN Ex. 5 (Response to Lincoln National's Request to Admit) at 14, 15. Likewise, there is no dispute that Lincoln National was never aware of any change in ownership, occupancy, or risk that Graphic Arts should have been notified of pursuant to the terms of the Policy's mortgage provision. LN Ex. 3 (Graf. Dep.) at 60:15-65:10.

Graphic Arts has waived any coverage defense on those grounds, particularly since it has not been prejudiced in its positions in this case and the claimed breach cannot create a forfeiture of its rights under the Policy.

## II.    Standard of Review

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996). The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original). Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. The facts shall be viewed, and all reasonable inferences drawn, in

the light most favorable to the non-moving party. *Id.* at 255; *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

### III. Plaintiffs' Claims

**A.      Requirements under the Protective Safeguards Endorsement**

Generally, a party that fails to comply with a condition precedent in a contract is not entitled to benefits under that contract. *See, e.g., U.S. Airways v. Commonwealth Ins. Co.*, 65 Va. Cir. 238, 240-241 (Va. Cir. Ct. July 23, 2004) (finding that both notice and proof of loss were conditions precedent to coverage because the plain language of the policy required satisfaction of the condition); *Aetna Cas. & Surety Co. v. Harris*, 218 Va. 571, 578, 239 S.E.2d 84, 88 (1977) ("It has long been settled in this state that if an insurance policy makes the furnishing of a proof of loss a condition precedent to action upon it, performance or waiver of it must be shown before a recovery can be had."); *Miller ex rel Hott v. Augusta Mut. Ins. Co.*, 335 F. Supp. 2d 727, 732 (W.D. Va. 2004) (holding that the duty to cooperate under an insurance policy is a condition precedent to coverage). The insured has the burden of proving that it complied with all conditions precedent. *See, e.g., Erie Ins. Exchange v. Meeks*, 223 Va. 287 (1982); *Maryland Cas. Co. v. R.A. Cole*, 156 Va. 707, 716, 158 S.E. 873, 876 (1931) ("[T]he burden is upon the Policyholder to bring himself within the terms of the Policy.").

The primary coverage dispute as between Breton and Graphic Arts revolves around the provisions set forth in paragraphs 1a and 2b of the Endorsement. The first issue regarding the Endorsement is whether Breton fulfilled its obligation to "maintain" an automatic sprinkler system set forth in paragraph 1a of the Endorsement. If so, the issues become (a) whether Breton knew of the closed valve that caused the system not to

operate during the fire; or (b) whether Breton had "control" over the sprinkler system and, if so, whether it fulfilled its obligation to "to maintain [the sprinkler system] . . . in complete working order."

   With respect to the first issue—whether Breton fulfilled the condition that it "maintain" an automatic sprinkler system, the material facts themselves are not in dispute. What is in dispute is the meaning of the word "maintain" in paragraph 1a of the Endorsement. On the one hand, Breton contends that this condition requires only that an automatic sprinkler system is installed in the building and not removed during the policy term. Pls. at 9 ("The effect of paragraph 1 is that the insured has agreed to have an automatic sprinkler system in the building."). On the other hand, Graphic Arts contends that this condition requires not only that an automatic sprinkler system be installed and not removed, but that the insured periodically inspect and keep the system in good operating order. Pls. Ex. 30 (Lupino Dep.) at 94:20-95:12. Base on that reading of the Endorsement, Graphic Arts claims that Breton "failed to maintain their sprinkler system because the main control valve was closed and no water entered the system at the time of the fire." Graphic Arts' Response in Opposition to Pls. at 12. The Policy does not define the term "maintain" and Virginia courts have not interpreted or applied the language of the Endorsement. Since Virginia law controls in this diversity case, this Court must predict how the Virginia courts would construe the word "maintain" in the Endorsement.[11] Accordingly, the Court must utilize the general rules of contract interpretation and construction that apply to insurance contracts under Virginia law.

---

[11] Some courts have aptly referred to this exercise as the "Erie guess." *See  Cooper v. Laboratory Corp. of Am. Holdings*, 150 F.3d 376, 380 (4th Cir. 1998).

Under Virginia law, the general rules that govern contract interpretation and construction apply to contracts of insurance. Under those rules, it is the court's role to interpret and apply the language of an insurance contract. *Seals v. Erie Ins. Exch.*, 674 S.E.2d 860, 862 (Va. 2009); *Lower Chesapeake Assocs. V. Valley Forge Ins. Co.*, 532 S.E.2d 325 (Va. 2000). When interpreting an insurance policy, the court's ultimate purpose is to give effect to the mutual intent of the parties to the contract. *Seals*, 674 S.E.2d at 862. The court determines the parties' intent by reference to their objective manifestations of that intent, as expressed in the language of the Policy. *Id.* at 860. A court determines the meaning of policy language by considering the policy as a whole. *Id.* at 862. For that reason, the court must not "examine certain specific words or provisions in a vacuum, apart from the policy as a whole." *Resource Bankshares Corp. v. St. Paul*, 407 F.3d 631, 631 (4th Cir. 2005) (applying Virginia law).

Undefined words are given their commonly understood meaning, but when a word has many definitions, it is up to the Court to decide which definition should apply. *Id. See Savage v. Com. Ex rel. State Corp. Commission*, 186 Va. 1012, 1020 (1947) ("The word 'maintain' has several meanings, each depending upon the context of the statement in which it is used."). For that purpose, in Virginia, special rules of construction come into play when the contract to be interpreted is a contract of insurance. Where there is an ambiguity, Virginia law follows the rule of *contra proferentem* and construes such language in favor of the interpretation that grants or maximizes coverage, rather than withholds or narrows coverage. *St. Paul Fire & Marine Ins. Co. v. S.L. Nusbaum & Co.*, 227 Va. 407, 411 (1984) ("Where two constructions are equally possible, that most favorable to the insured will be adopted."); *see also Government*

*Emples. Ins. Co. v. Moore*, 266 Va. 155, 165 (2003) ("Doubtful, ambiguous language in an insurance policy will be given an interpretation which grants coverage, rather than one which withholds it."). This Court must therefore determine whether the word "maintain" in paragraph 1a of the Endorsement is ambiguous, and if so, whether there is a reasonable meaning of "maintain" that grants coverage. Based on the straight-forward application of Virginia law's settled rules of contract interpretation and construction as they apply to insurance contracts, the Court finds that the use of the word "maintain" in the Endorsement is ambiguous and that there is a reasonable meaning within the context of the Policy that provides coverage.

The threshold question for determining whether a court will apply the doctrine of *contra proferentem* is whether the policy language is ambiguous. A policy is ambiguous if it can be reasonably interpreted in more than one manner. *Seals*, 674 S.E.2d at 862; *see also Resource Bankshares Corp. v. St. Paul*, 407 F.3d 631, 636 (4th Cir. 2005). Here, there is a wide range of meanings of "maintain." For example, the American Heritage Dictionary provides seven definitions for the verb "maintain," from the restrictive and narrow meaning "to keep in existence," to "keep in an existing state; preserve or retain," to the broader meaning "[t]o keep in a condition of good repair or efficiency."[12] Similarly, among the definitions included in Webster's dictionary is "to keep in existence

---

[12] The American Heritage Dictionary defines "maintain" as follows:

1. To keep up or carry on; continue: *maintain good relations.*
2. To keep in an existing state; preserve or retain: *maintain one's composure.*
3. To keep in a condition of good repair or efficiency: *maintain two cars.*
4. a. to provide for; support: *maintain a family.*
   b. to keep in existence; sustain: *enough food to maintain life.*
5. To defend or hold against criticism or attack: *maintained his stand on taxes.*
6. To declare to be true; affirm: *maintained her innocence.*
7. To adhere or conform to; keep: *maintain a busy schedule.*

or continuance." Black's Law Dictionary has a number of definitions for "maintain," as it relates to property, that range from "to continue in possession of" to "to care for (property) for purposes of general repair and upkeep."[13] Following the rule of *contra proferentem*, the Court finds that the narrower definition of "maintain" is both a reasonable one and one that increases rather than denies or decreases coverage. In reaching this conclusion, the Court finds significant that the word "maintain" appears again in paragraph 2b of the Endorsement with the qualifying phrase "in complete working order." Specifically, paragraph 2b excludes coverage where the insured "[f]ailed to maintain [the automatic sprinkler system] . . . in complete working order." When considering both usages, the Court must conclude that the word "maintain" in paragraph 1a must have a meaning more limited than the phrase "maintain in complete working order."[14] While there certainly could be imported into the word "maintain" duties that fall short of those necessary to keep a sprinkler system "in complete working order," there is no need to do so in order to reach a reasonable meaning for the purposes of paragraph 1a.[15] This is particularly the case since to impose implied duties on an insured

---

[13] Black's Law Dictionary 1039 (9th ed. 2009) ,has the following definitions for maintain:

    1.   to continue (something)
    2.   to continue in possession of (property, etc.)
    3.   to assert (a position or opinion); to uphold (a  position or opinion) in argument
    4.   to care for (property) for purposes of general repair and upkeep
    5.   To support (someone) financially; esp[ecially] to pay alimony to
    6.   (of a third party to a lawsuit) to assist a litigant in prosecuting or defending a lawsuit; to meddle in someone else's litigation

[14] Graphic Arts does not propose a definition of the term "maintain" in paragraph 1a of the Endorsement or the phrase "maintain . . . in complete working order" in paragraph 2b. Nor does it delineate any difference in meaning between "maintain" and "maintain in complete working order." Rather, it appears that Graphic Arts conflates the two usages and views the duties imposed by either usage as co-extensive with those imposed by the other.

[15] Graphic Arts cites a number of cases from other jurisdictions that involve coverage disputes centered around the application of Protective Safeguards Endorsements. None of these cases, however, appear to address the particular questions before this Court. In some, it is unclear whether the court is construing the

through the vagaries of the word "maintain"—such as a duty to access, inspect and repair a leased property—would necessarily require an insured to guess at what its duties and responsibilities are, something that Virginia law seeks to avoid when interpreting the language of an insurance policy. *See Caldwell v. Transportation Ins. Co.*, 234 Va. 639, 644 (Va. 1988) (explaining the pragmatic reasons behind *contra proferentem* in Virginia). It would be an easy matter for an insurance company to spell out a duty of periodic inspections or repairs were that in its contemplation when it adopted the language it did in paragraph 1a of the Endorsement. In this case, it would appear that once a sprinkler system was installed and kept in place, Graphic Arts felt itself adequately protected by way of the duties imposed through the loss exclusion language in paragraph 2, which represents a commercially reasonable accommodation of competing interests in a commercial property.[16]

2.     The Coverage Exclusions Contained in the Protective Safeguards Endorsement

Having determined that Breton satisfied the condition set forth in paragraph 1a of the Endorsement, the Court must now determine whether either of the two loss exclusions

---

stand alone word "maintain" in paragraph 1a or as part of the phrase "maintain . . . in complete working order." *See, e.g., Goldstein v. Fidelity & Guar. Ins. Underwriters*, 86 F.3d 749 (7th Cir. 1996) (holding that an existing, but non-operable sprinkler system in a building was a violation of the Protective Safeguards Endorsement, but not stating whether it was a violation of the duty to maintain or to "maintain in complete working order"); *Burmac Metal Finishing Co. v. W. Bend Mut. Ins. Co.*, 356 Ill. App. 3d 471, 475 (2005) (holding that the Protective Safeguards Endorsement requires a sprinkler system to be kept in an operable condition without specifically what the different clauses mean). In another case, the court considered whether a protective device was "maintained" where the building in which it was located did not have electricity and the system was therefore never placed into service. *Mangiacotti v. U.S. Liability Insurance Company*, No 0 P 454, 2004 WL 1933611 (Mass App. Ct. Aug. 31, 2004) (holding that smoke detectors that were not activated because the building did not have electricity were not "maintained" as required by the Protective Safeguards Endorsement, but cited both paragraphs 1a and 2b as the violated section of the endorsement). The cited cases also all involved situations where the insured clearly maintained "control" over the protective devices at issue, making the distinctions in the usage of "maintain" in paragraph 1a and 2b unimportant.

[16] It should also be observed that Graphic Arts was not without the ability to protect itself from any perceived risks as a result of Breton's conduct. Under the Policy, Graphic Arts had the right to cancel the Policy for any reason or no reason, upon 30 days notice. Pls. Ex. 2 (Policy) at CP 01 30 05 04 § A.

of Paragraph 2 applies. The first exclusion applies where the insured "knew of any suspension or impairment" in the automatic sprinkler system. The second exclusion applies, as discussed above, where the insured failed to maintain the sprinkler system in complete working order, but only if the insured had "control" over it. Breton contends that neither exclusion is applicable here. Graphic Arts contends the second exclusion applies. "[W]here an insured has shown that his loss occurred while an insurance policy was in force, but the insurer relies upon exclusionary language in the Policy as a defense, the burden is upon the insurer to prove that the exclusion applies to the facts of the case." *Bituminous Casualty Corp. v. Sheets*, 239 Va. 332, 336 (1990). Accordingly, Graphic Arts has the burden to prove that one of the exclusions in the Protective Safeguards Endorsement apply.

### a.  *Breton's Knowledge of any Suspension or Impairment*

Graphic Arts does not contest Breton's statement that Breton had no knowledge that the sprinkler system was suspended or impaired. *See* Pls. at 5.[17] Accordingly, Graphic Arts has not shown that Breton's loss falls within the first exclusion.

### b.  *Breton's Control Over the Sprinkler System*

The parties dispute the meaning of the term "control" as used in the second exclusion. It appears from the record before the Court that the Sprinkler Room where the Supply Valve is located was part of the Property that was leased by Breton to Alexandria Packaging Co. and then to Ragan Coffee, that Breton did not have keys to the warehouse or the Sprinkler Room, and that Breton, therefore, did not have the actual ability to enter without force the Property generally or the Sprinkler Room, in particular. *See* Pls. Ex. 31

---

[17] Graphics Arts instead relies on the opposite argument, that Plaintiff had no knowledge of the status of the system because no one had inspected it for years preceding the fire. *See* GA at 8.

(Ragan Coffee Dep.) at 24; Ward Aff. at ¶¶ 29, 31; Stoddard Aff. at ¶ 23.  Accordingly, Breton contends that it did not have "control" over the sprinkler system or the Supply Valve and that the second exclusion does not apply. Graphic Arts argues that Breton must be deemed to have had "control" since it owned the Property, but chose to divest itself of actual control in fact when it leased the Property, and that it should therefore not benefit from that "control" qualification in the loss exclusion. The issue then becomes whether Breton violated any duties or obligations to Graphic Arts by leasing the Property and divesting itself of actual control over the Property for the term of the leasehold so that it may not claim lack of control for the purposes of the loss exclusion. In resolving that issue, the Court is again faced with how to interpret ambiguous language of an insurance contract, specifically the word "control."

As a practical matter, given Ragan Coffee's exclusive, actual possession of the Property pursuant to the lease, Breton did not have "control" over the sprinkler system in the sense that it had physical dominion over it or unfettered access to it. On the other hand, legal "control" of the Property resided originally in Breton as the owner of the Property before transferring the exclusive right of occupancy to Ragan Coffee.  The Court concludes, as it must under the rule of *contra proferentem*, that the word "control" refers to the actual ability to access and exercise dominion over the sprinkler system, not Breton's in fee ownership rights over the Property. To construe "control" as Graphic Arts proposes would effectively eliminate in many, if not most, situations the qualification in paragraph 2b applies to since one would expect fire insurance policies to be often issued, as in this case, to persons who own the insured property. This conclusion is reinforced by the language of paragraph 2b itself, which contemplates situations in which an insured

18

will have divested itself of "control," coupled with the absence in the Policy of any obligation to retain "control" or any prohibition or restriction on leasing an insured property, as discussed further below. Based on the record before the Court, the Court concludes that Breton did not have "control" over the sprinkler system at the time of the fire for the purposes of paragraph 2b of the Endorsement.[18]

### B. Applicability of the "Transfer of Your Rights and Duties" Clause

The Policy contains as part of the "Common Policy Endorsement" a provision titled "Transfer of Your Rights and Duties Under This Policy." Pls. Ex. 2 (Policy) at Form IL 00 17 11 98 § (F) at 40. This anti-transfer provision provides that "rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named Insured." Graphic Arts claims that Breton violated this Transfer of Rights provision when, without its consent, Breton entered into its lease with Ragan Coffee that required Ragan Coffee to "maintain [the Property] in good condition and repair." *See* GA at 12. More specifically, Graphic Arts claims that Ragan Coffee's responsibilities under the lease constitute a transfer of Breton's "rights and duties" under the Endorsement, all in violation of the Transfer of Rights provision. From that premise, Graphic Arts claims that Breton may not recover under the Policy since it may not escape the loss exclusion under paragraph 2b by claiming that it did not have

---

[18] Breton makes certain other arguments with respect to paragraph 2b. The first is that, irrespective of who had "control" over the sprinkler system, it satisfied any obligation to "maintain [the sprinkler system] . . . in complete working order" since the system was fully "operable" in the sense that but for the closed Supply Valve, the sprinkler would have discharged water, relying on the words "impairment" and "suspension" in paragraph 2a to limit the meaning of paragraph 2b. The Court does not need to rule on this argument. The Court also need not rule on Breton's contention that the "Control of Property Clause" ("Any act of neglect of any person other than you beyond your direction or control will not affect this insurance.") would grant coverage in any event, since even if it had control over the sprinkler system, there is no evidence that the person responsible for the turning off the Supply Valve was someone who acted at Breton's direction or under its control.

"control" of the sprinkler system. Although not framed in these terms, Graphic Arts essentially contends that since Breton voluntarily divested itself of control, it is estopped from claiming that it is relieved of the duty to maintain the sprinkler system because of lack of control.

Graphic Arts' position is unavailing for several reasons. With respect to Breton's obligation under paragraph 1a of the Endorsement, the Court has already concluded that Breton's obligations did not include duties of inspection or repair, and for that reason, the lease cannot in any respect be construed as a transfer of Breton's obligations under that paragraph. With respect to paragraph 2b of the Endorsement, Breton's obligation to "maintain [the sprinkler system] . . . in complete working order" is qualified by its having "control" over the system. Even were one to consider the lease's repair and maintenance clause a transfer of "rights and duties" under paragraph 2b, the central issue is whether that provision, or the lease generally, transferred "control" over the sprinkler system in violation of the Transfer of Rights clause. First, there is nothing in the Policy that prohibits Breton from leasing the Property. The absence of any such restriction is particularly telling since as a matter of law, a leasehold carries with it the obligation on the part of the tenant to maintain and repair the property in Virginia.[19] *See Wohlford v. Quesenberry*, 259 Va. 259, 261 (2000) (holding that a tenant has common law duties to

---

[19] The record evidences that Graphic Arts had notice of Breton's lack of access to the Property since 2002. There is also no evidence in the record that Graphic Arts ever took the position that Breton's leasing of the Property or Breton's known lack of access to the Property was a violation of the Endorsement or any other provision of the Policy, but rather Graphic Arts renewed the Policy in 2007 without any expression of concern. The record also reflects that even though Graphic Arts clearly knew the building was being leased and that Breton could not access the Sprinkler Room or the Property generally, Graphic Arts did not take the position that Breton was in violation of its obligations under the Endorsement or even that Breton's conduct had established grounds for cancellation. Rather, on October 27, 2007, after it was unable to inspect the Sprinkler Room because Breton did not have a key, it made "recommendations" about the Sprinkler Room and requested Breton to respond to its recommendations within 45 days.

provide repairs and upkeep to the property even if the lease is silent on the subject) (citing *Kesler v. Allen*, 233 Va. 130, 133 (1987); *Paytan v. Rowland*, 208 Va. 24, 26, (1967)). Ragan Coffee's repair obligations pursuant to the express terms of the lease appear to substantially duplicate its common law obligations in the absence of that provision. To adopt Graphic Arts' position would, in effect, import into the Policy an implied restriction on an insured owner's right to lease an insured property. Second, there is no express condition or covenant in the Policy that requires Breton to retain "control" or a prohibition against divesting itself of "control" over the Property. Third, paragraph 2b itself suggests that Graphic Arts contemplated situations where an insured, such as Breton, would in fact divest itself of control, in whole or in part, as the Endorsement effectively gives such insureds a "safe harbor" should the equipment fail under those circumstances. For all these reasons, and construing the Policy reasonably but in a way that maximizes coverage, the Court concludes that Breton did not violate the Transfer of Rights provision of the Policy by entering into the Ragan Coffee lease.[20]

Based on the above, the Court concludes that Breton has satisfied its obligations under paragraph 1a of the Endorsement and its losses from the fire are not excluded under paragraph 2 of the Endorsement.

### IV. Lincoln National's Cross Claim

The Court must next decide whether it should address Lincoln National and Graphic Arts' cross motions for summary judgment on Lincoln National's cross-claims against Graphic Arts. While it appears from the mortgage clause that the same issues are

---

[20] Because the Court finds that Breton did not transfer any duties under the Policy, we need not address whether the Transfer of Rights provision is more restrictive than the statutorily required language set forth in Va. Code § 38.2-2104 ("Assignment of this policy shall not be valid except with the written consent of the Company.").

presented with respect to Lincoln National's status whether or not Breton is entitled to

coverage, Lincoln National requests a declaration as to its entitlements under the Policy

only in the event that this Court concludes that Breton is not entitled to coverage under

the Endorsement.  It therefore appears that there is no issue before the Court as between

Breton and Lincoln National, or as between Lincoln National and Graphic Arts, as the

Court has now ruled that there is coverage for Breton's claims.

Federal courts recognize that they must proceed carefully when deciding

uncertain issues of state law. Only when necessary to resolve a dispute should a federal

court decide state law issues, particularly when state law issues are ambiguous, uncertain

or undecided. *See Bernstein v. Travelers Ins. Co.*, 447 F. Supp. 2d 1100, 1103 (N.D. Cal.

2006).  For these reasons, this Court sees no present reason to rule on the several

undecided issues of Virginia law presented by Lincoln National's cross-claims.[21]

## Conclusion

---

[21] The Policy contains a "standard" or "union" mortgage clause that creates a separate and independent contract between the mortgagee and the insurer, such that no act or neglect of the insured may defeat the mortgagee's right to recover the insurance proceeds under the Policy. *Cent. Union Bank of S.C. v. N.Y. Underwriter's Ins. Co.*, 52 F.2d 823, 825 (4th Cir. 1931). Lincoln National argues that since it is the successor to both JP Life, which is listed as the mortgagee on the Policy, and JP Financial, which has the financial interest in the Property, it acquired the status of a listed mortgagee with a financial interest in the Property and must then be able to recover under the Policy.  The issue, however, is not whether Lincoln National succeeds to whatever rights the Jefferson Pilot entities had, but what those rights were and whether those separately acquired interests joined in Lincoln National before the fire in such a way that Lincoln National can recover under the Policy to an extent greater that JP Life would have been able to recover, had JP Life and JP Financial not merged into Lincoln National. That issue in the end reduces to whether the listing of JP Life as a mortgagee was, in effect, a legal nullity *ab initio*, such that JP Life had acquired by that listing no rights that Lincoln National could succeed to as a matter of law; or whether, rather than a legal nullity, JP Life's listing as a mortgagee conferred upon JP Life the right—standing if you will—to recover under the mortgage clause whatever loss was caused by the fire as measured by its financial interest in the Property at the time of the fire, whenever and however acquired.  Under the former view, all that matters is whether JP Life held an interest in the Property at the time it was listed as a mortgage holder. Under the latter view, all that matters is what interest in the Property JP Life or its successor held at the time of the loss and it is immaterial whether JP Life held an interest in the Property at the time it was listed as a mortgagee. Other unclear state law issues that may be implicated in resolving Lincoln National's cross-claims include whether this Court may reform the Policy within the procedural posture of this case.

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is granted and Defendant Graphic Arts Mutual Insurance Company's Motion for Summary Judgment as to Claims by Plaintiffs is denied. Additionally, Defendant and Cross-Plaintiff Lincoln National's Motion for Summary Judgment and Defendant Graphic Arts Mutual Insurance Company's Motion for Summary Judgment as to Claims by Jefferson Pilot Life Insurance Company Merged with the Lincoln National Life Insurance Company are denied as moot

The Court will issue an appropriate Order.

_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
November 10, 2009